**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RANDY VEEDER,

       *Plaintiff*,

*v.*

TRI-CAP, SANDRA EAGLE,
BRIAN MAGIPORA, OPEN
DOOR, NEW PATHS, INC.,
and WILLIAM RALEIGH,

       *Defendants*.

_____/

CASE NO. 17-cv-11690

DISTRICT JUDGE TERRENCE G. BERG

MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION TO AMEND (R. 72) AND MOTION TO EXTEND DISCOVERY (R. 73)

### I. Recommendation

Two matters are before the Court. The first is another of Plaintiff Randy Veeder's motions to amend his complaint. (R. 73.) It is his fifth such motion. Because of the long delay in filing it, the resulting prejudice to Defendants, and the futility of certain proposed amendments, I **RECOMMEND DENYING** the motion. The second matter is Plaintiff's request to extend discovery, which was in part prompted by the thought that his vast additions in his proposed amended complaint would necessitate more discovery. (R. 73.) But because his motion to amend should be denied, and he has not otherwise justified the need for additional discovery, I **RECOMMEND DENYING** his request.

## II. <u>Report</u>

### A. Background

On May 22, 2017, Plaintiff filed his initial complaint. Over the course of the next six months, he made four motions to amend his complaint. (Docs. 9, 13, 15, 19). On January 2, 2018, the Court granted his most recent motion to amend, (Docs. 19, 20), and thus his proposed amended complaint supplanted his initial complaint. *See* (Doc. 25). His other motions to amend were then dismissed as moot. (Doc. 20).[1]

#### 1. Current Complaint

I described the current amended complaint in an earlier Report:

> Against this host of defendants, Plaintiff levies accusations of numerous civil rights violations, beginning in July 2015 in Midland County. (Doc. 25). There, his parole agent Sandra Eagle and her supervisor, William Raleigh, "forced [Plaintiff] to reside at the Open Door . . . a homeless shelter that is run by a church in Midland." (*Id.* at PageID.134). He states that Open Door forced its residents to "wake up and attend prayer every morning, also Tuesday night meeting, religious speaker, coffe[e] house every month, and attend church on Sundays." (*Id.*). Plaintiff asserts that "Corrections employee[s were] constantly trying to force the Plaintiff to 'choose a religion' or force the Plaintiff into some kind of faith-based program or housing." (*Id.* at PageID.134-135).

> He has similar complaints about the TRI-CAP residential program, where he says his caseworker and other staff "forced [him] to attend a faith based," church-run program called "RU" to meet a weekly hours requirement. (*Id.* at PageID.136). Failure to meet the requirement would allegedly have resulted in a write up, termination from the program, a probation or parole violation, and jail or prison time. (*Id.*).

---

[1] The Order granting leave to amend told Plaintiff that the complaint attached to his motion (R. 19) would be the operative complaint. (R. 20.) Nonetheless, on the same day the Order entered, Plaintiff filed his proposed complaint again. (R. 25.) These two complaints are identical for all relevant purposes.

While Plaintiff was a resident at TRI-CAP, he alleges, Eagle and probation agent Brian Magipora "forced" him to participate in a program that put him to work in a Saginaw cemetery. (*Id.* at PageID.135). He describes working outside in winter without proper food or clothing, and also complains that he had to work as a pall bearer and "acknowledge and participate with ceremony from family's church, pastor and prayer." (*Id.* at PageID.135-136).

A significant portion of the Amended Complaint revolves around an incident that occurred at TRI-CAP on February 17, 2017, as Plaintiff and others returned from work. (*Id.* at PageID.137). TRI-CAP staff routinely strip-searched returning residents, but Plaintiff alleges that on this occasion, the search crossed a line into sexual assault. (*Id.*). He describes how TRI-CAP staff member Lacross instructed the residents to strip and stand with their hands against the wall, and then spread each resident's buttocks to search for contraband in the anal cavity. (*Id.*). Lacross had never touched Plaintiff's buttocks during a search before, and Plaintiff makes no allegation that any employee has done so since. (*Id.*). He also alleges that Lacross's supervisor, Burgess, participated in this invasive instruction, and "trained" staff to perform strip searches. (*Id.* at PageID.138).

When the incident came up during group therapy that night, the residents' therapist informed them that they could call the police and make a complaint. (*Id.* at PageID.139). Plaintiff and five other residents called 911, and when police arrived, Burgess entered the therapy group and sent the therapist home (another therapist filled in for the rest of the day). (*Id.*). Burgess remained in the room and sent text messages to Lacross while Plaintiff and other residents made their statements to police, which Plaintiff viewed as intimidation. (*Id.* at PageID.138).

Plaintiff argues that Burgess violated HIPAA confidentiality by entering their group therapy session and sending the therapist home, as well as by relaying to other residents and staff what the therapist had discussed with residents. (*Id.* at PageID.139). Further, Plaintiff says he was "humiliated and degraded" for making a statement to police. (*Id.* at PageID.140).

This specific occasion aside, Plaintiff also complains Burgess "had previously asked Veeder and other residents 'where are the drugs at[,] in your ass?' and had his cell phone out and turned on in bathroom at TRI-CAP during strip search." (*Id.* at PageID.149). He asserts that Davis, Beaman, Ervin, Cochran, and Nadzan had been made aware of "numerous" complaints about Burgess and took no action. (*Id.* at PageID.138, 149).

3

Magipora and Eagle were also aware of Plaintiff's complaints about TRI-CAP and "ignored" his request for a pass to access legal materials or "to talk to a[n] attorney to make a complaint." (*Id.* at PageID.140). Magipora informed Plaintiff that if he was uncomfortable being at TRI-CAP, he could move Plaintiff to New Paths, but that Plaintiff would have to start over with no credit for the time he had spent at TRI-CAP. (*Id.*).

On April 20, 2017, Plaintiff absconded from TRI-CAP and was arrested and sentenced to 30 days in jail. (*Id.* at PageID.141). He was then ordered to enter a residential program at New Paths, in Flint, Michigan. (*Id.*).

Plaintiff told his caseworker, Mitchell, that he needed access to legal materials and described his complaints about TRI-CAP, to which Mitchell responded that "he would not be allowed to have any access to any legal materials or . . . a pass for that purpose." (*Id.* at PageID.141-142). Other staff at New Paths, including the director, Hutchinson, gave him the same answer. (*Id.* at PageID.142).

Plaintiff makes several additional allegations of civil rights violations that occurred at New Paths. First, he asserts his due process rights were violated when New Paths staff made him "restart the SUD program" for taking items from an open vending machine without issuing him a write-up or providing a hearing. (*Id.* at PageID.142, 150). The incident also resulted in probation violation proceedings. (*Id.*).

Second, Plaintiff argues his First Amendment rights were violated when Mitchell "and staff" terminated him from New Paths for making a Facebook post from his cell phone about the "poor conditions of living" at the facility. (*Id.* at PageID.143, 151). Additionally, he says that his due process rights were violated because he had no chance to challenge the violation and no notice of or hearing regarding the termination. This is despite the fact, according to Plaintiff, that "[r]esidents at New Paths Inc. are allowed to have cell phones outside in the lockbox," and there are "no rules against having internet or social networking." (*Id.* at PageID.142).

The alleged constitutional violations described above caused Plaintiff "[e]motional and mental anguish, loss of freedom, anxiety, nightmares, panic attacks . . . [and] humiliation." (*Id.* at PageID.145).

(R. 21, at PageID.102-106.)

4

### 2.  Procedural History

Numerous claims and parties have been dismissed. The Court held that the complaint failed to state a claim against various defendants: "Ms. Beaman," Janet Cochran, Gary Davis, Vicki Ervin, "Mr. Floyd," the Michigan Department of Corrections (MDOC), Pamela Nadzan, Heidi Washington, and "Mr. Williams." (R. 21, at PageID.108-109; R. 23.) The allegations against this group failed for various reasons: one was barred by sovereign immunity, a few did not specify actions the defendants took, and others rested on supervisor liability, a non-viable theory under 42 U.S.C. § 1983. (R. 21, at PageID.108-109.) Further, the allegations against Defendant Lacross regarding the cavity search did not rise to the level of an Eighth Amendment violation. (R. 21, at PageID.110-111.) Plaintiff's HIPAA claims were tossed because that statute does not provide a private right of action. (R. 21, at PageID.111-112.)

Later, Defendant Burgess was dismissed because the amended complaint failed to state a claim against him, as it did not allege he participated in any of the constitutional violations. (R. 53, at PageID.327; R.60.) Nor did the complaint "adequately describe how [Defendants Hutchinson's and Mitchell's] conduct impeded [Plaintiff's] pursuit of a cognizable constitutional claim," and thus his claim against them for violating his First Amendment right to access the courts was dismissed. (R. 53, at PageID.329-332.) The complaint did not make any claims with regard to Defendant Lewis, who was dismissed; Defendant Tri-Cap Board of Directors was dismissed since Tri-Cap's strip search policy was constitutional. (R. 53, at PageID.332-333.)

5

More recently, claims against Defendant Magipora concerning Open Door were dismissed because Plaintiff failed to make any allegations that linked Magipora to the events at Open Door. (R. 59, at PageID.405; R. 60.) The claims against Defendants Eagle and Magipora regarding the strip search that occurred at Tri-Cap were also dismissed because there were no allegations these Defendants were personally involved in the search and because the search was not unconstitutional in any event. (R. 53, at PageID.390.)

### B. The Proposed Complaint

Plaintiff's new proposed complaint attempts to resurrect many of the dismissed claims and parties. (R. 72.) A few new names appear too. The substantive allegations are largely the same. This time, however, he asserts that Defendants Eagle and Raleigh "forced" him to reside at Open Door; Eagle, when presented with Plaintiff's objections, told him he had to remain. (R. 72, at PageID.474.) He adds a new Defendant to the mix, Ken Hicks, who worked for Open Door and helped parole officials keep Plaintiff at the program. (R. 72, at PageID.475.) Defendants Eagle, Magipora, and Raleigh later ordered Plaintiff to attend Tri-Cap, where he had to participate in Narcotics Anonymous and church-based programming. (R. 72, at PageID.476.) Defendant Pamela Nadzan, a Tri-Cap employee, (and a dismissed Defendant making a return appearance) also required Plaintiff to participate in these programs. (R. 72, at PageID.473, 477.) Likewise, Defendants Eagle, Magipora, and Raleigh "would violate [Plaintiff's] probation and parole and incarcerate [him]," presumably if he did not participate in the programming at Tri-Cap. (*Id.*)

Plaintiff alleges that Defendant Vicki Ervin (another individual who has already been dismissed) forced him to work at the cemetery despite knowing that he had "bi-polar, manic depressive personality disorder." (R. 72, at PageID.477-478.) Two new Defendants, "Nick" and "Warren," were employed by the cemetery and required Plaintiff to participate in funerals there, including religious services. (R. 72, at PageID.478.) They also forced Plaintiff to work outside in freezing conditions without adequate clothing. (R. 72, at PageID.479.) Nick and Warren also exposed Plaintiff to danger, providing no safety training and forcing him to drive the cemetery's vehicles "through the city of Saginaw . . . without a valid driver[']s license" or insurance. (R. 72, at PageID.480.) On one occasion, Plaintiff cut his hand but no one took him to the hospital. (R. 72, at PageID.481.)

The new complaint also recounts the strip search Defendant Lacross conducted, adding that Defendant Eric Burgess had ordered it. (R. 72, at PageID.479, 481-482.) Both Lacross and Burgess are former Defendants who have been dismissed from the case. Plaintiff now adds that Nick and Warren sexually harassed him, apparently because he underwent the strip search. (R. 72, at PageID.479, 484.) Defendants Magipora and Ervin knew about these cruelties but did nothing; in fact, it was Ervin's policy that required regular strip searches. (R. 72, at PageID.480-481.) Magipora suggested that Plaintiff could start over somewhere else, without any credit for all the days he had been at programs. (R. 72, at PageID.480.) Defendants Burgess and Tri-Cap retaliated against Plaintiff— apparently due to his calling the police during the therapy session—by refusing to allow his therapist to return. (R. 72, at PageID.483.) They also prevented Plaintiff and others

from making "a complaint," although Plaintiff does not mention his prior allegation that he was prevented from accessing the court. (R. 72, at PageID.484.)

After Plaintiff escaped Tri-Cap, Defendants Magipora, Eagle, and Raleigh forced him into New Paths. (*Id.*) He complains that New Paths, without any due process, took his cell phone, although he eventually reacquired it and was allowed to keep it outside the building. (R. 72, at PageID.485.) However, when New Paths employee "Ms. Rodrigues" (another new Defendant) found him with it inside, it was confiscated. (R. 72, at PageID.486.) Defendants Lewis and Burnetta Mitchell, prior parties in this case, forced Plaintiff to begin the program from "day one," with "zero days credit." (R. 72, at PageID.485.) Later, Plaintiff was accused of theft from a vending machine; Defendants Lewis and Mitchell convened a meeting without Plaintiff and terminated him from the program. (R. 72, at PageID.486.) Their decision might have somehow related to complaints about New Paths that Plaintiff posted on Facebook. (*Id.*) In the end, he received no due process from Defendants New Paths, Lewis, Mitchel1, or "Mr. Jones," another fresh face in the complaint (R. 72, at PageID.487.)

Finally, in his "legal claims" section, Plaintiff repeats many of his current claims. His First Amendment rights were violated by forced participation in religious activities (including Narcotics Anonymous). (R. 72, at PageID.488.) He now challenges the strip search under the Fourth Amendment as an unreasonable search. (R. 72, at PageID.488-489.) Defendants New Paths, Mitchell, Lewis, Rodrigues, and Jones violated Plaintiff's First Amendment by retaliating for his Facebook comments. (R. 72, at PageID.489.) He

also states, "and Fourteenth Amend. US. Const. for failure to give the plaintiff any due process when Plaintiff was punished, wrote up and terminated, then incarcerated . . . ." (*Id.*) Finally, he cites a panoply of constitutional violations and a new statutory claim: "All Defendants retaliated [*sic*] against the plaintiff for exer[cising] his constitutional rights, and equal protection clause of the Fourteenth Amend. Eighth Amendment, Cruel and Unusual punishment by the total events combined, Title II of the American[s] With Disabilit[ies] Act. United States Constitution." (*Id.*)

## B.  Analysis

### 1. Motion to Amend

#### a. General Legal Standard

Federal Rule of Civil Procedure 15(a)(1)(A) gives plaintiffs the right to amend their complaints "once as a matter of course within . . . 21 days after serving it." In all other circumstances, Rule 15(a)(2) applies: "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." The decision to grant or deny a motion to amend is within the sound discretion of the court. *Robinson v. Michigan Consol. Gas Co., Inc.*, 918 F.2d 579, 591 (6th Cir. 1990). Factors to consider include undue delay in filing the motion, notice to the opposing party, prejudice to the opposing party, and the futility of the proposed amendment. *Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989) (quoting *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973)).

### b. Arguments

Plaintiff offers no arguments to justify his latest motion to amend. Defendant Tri-Cap opposes the motion, presenting an argument joined by Defendants New Paths and Open Door. (R. 75-78.) Tri-Cap contends that the amendment should be denied because "it would cause undue delay and be unduly prejudicial to TRI-CAP." (R. 75, PageID.511.) The highlights of the argument are the observations that the case has gone on for over two years, Plaintiff "has already had five bites at the apple" through five iterations of the complaint, the end of discovery was approaching (and has now passed, on June 5, 2019), and the dispositive-motion deadline looms in July. (R. 75, PageID.512.)

Prejudice results from the "brand-new allegations against TRI-CAP employee Vicki Ervin and an apparent new claim somehow stemming from the Americans with Disabilities Act due to his bi-polar disorder." (*Id.*) Tri-Cap notes that Plaintiff has failed to explain why these claims, which Plaintiff must have known about earlier, could not have been included in his original complaint or his many amended versions. (*Id.*) Finally, according to Tri-Cap, the new complaint "re-alleges many of the same factual and legal arguments the Court has previously dismissed (e.g., claims relating to the strip searches at TRI-CAP)." (R. 75, PageID.514.)

### c. Application

Plaintiff is well past the period in which he could amend as a matter of course under Rule 15(a)(1). To prevail on his current motion he must obtain the Court's permission, which is normally "freely" given "when justice so requires." Fed. P. Civ. R. 15(a)(2).

When the motion comes this late in the case, courts are less inclined to find that "justice . . . requires" allowing amendment. "[O]rdinarily, delay alone will not justify the denial of leave to amend the complaint. . . . Delay, however, will become 'undue' at some point, 'placing an unwarranted burden on the court,' or '"prejudicial,"' placing an unfair burden on the opposing party." *Bridgeport Music, Inc. v. Dimension Films*, 401 F.3d 647, 662 (6th Cir. 2004) (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)). Thus, sufficiently prejudicial delay can justify rejecting a proposed amendment.

Such delay can occur when the motion to amend runs up against case deadlines. The Sixth Circuit, for example, has "held that allowing amendment after the close of discovery creates significant prejudice, and other Circuits agree." *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999); *see also Commerce Benefits Gp., Inc. v. McKesson Corp.*, 326 F. App'x 369, 376 (6th Cir. 2009) (upholding denial of motion to amend when it was filed after the discovery and dispositive-motion deadlines and after a motion for summary judgment had been filed); *Shane v. Bunzl Distribution USA, Inc.*, 275 F. App'x 535, 537 (6th Cir. 2008) (citing *Duggins*). Even if the motion is made before these deadlines pass, it can be denied if "much else had occurred by that time" and the court "reasonably determine[s] that allowing the amendment would . . . require[] the parties and the court to backtrack and redo work that had already been completed . . . ." *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 791 (6th Cir. 2011).

Adding new claims "at such a late stage in the litigation" also can cause prejudice, *Commerce Benefits Gp.*, 326 F. App'x at 376, especially if the amendments add multiple

new claims that would result in "substantial additional discovery . . . ." *Johnson v. Methodist Med. Ctr. of Illinois*, 10 F.3d 1300, 1304 (7th Cir. 1993); *see also Duggins*, 195 F.3d at 834 (noting that a late-filed motion to amend created significant prejudice).

Courts also consider when the plaintiff knew about the new claims or facts sought to be added. If they were known, or should have been known, long before the plaintiff sought amendment, courts are less eager to grant the motion. In one case, the Sixth Circuit upheld a denial of leave to amend because, in part,

> [t]he Plaintiff was obviously aware of the basis of the [proposed new] claim for many months, especially since some underlying facts were made a part of the complaint. Plaintiff delayed pursuing this claim until after discovery had passed, the dispositive motion deadline had passed, and a motion for summary judgment had been filed. There appears to be no justification for the delay, and the plaintiff proposes none. Allowing amendment at this late stage in the litigation would create significant prejudice to the defendants in having to reopen discovery and prepare a defense for a claim quite different from the [one] . . . that was before the court.

*Duggins*, 195 F.3d at 834; *see also George*, 641 F.3d at 790 (upholding denial of motion when the plaintiffs knew at the outset of the case about the facts giving rise to the proposed amendments but waited to seek amendments); *Johnson*, 10 F.3d at 1304 ("The choice to leave these claims out of the pleadings for so long a time after plaintiff must have known of them, suggests a doubt about being able to prove these failures or, if proved, that they caused Wanda's injuries."); *cf. Shane*, 275 F. App'x at 536 (when Plaintiff did not move to amend until after the scheduling deadline for filing motions to amend had passed, the court noted that his "problem is that his attempt to file a third amended complaint (his fourth complaint in the case) did not seek to add anything new—anything he did not already

know before the pleading deadline came and went"); *Leary v. Daeschner*, 349 F.3d 888, 907 (6th Cir. 2003) (rejecting amendment, in the same scenario as *Shane*, when "Plaintiffs here were 'obviously aware of the basis of the claim for many months,' but nonetheless failed to pursue the claim until after it was brought to their attention by [Defendant's] final summary judgment motion" (citation omitted)).

The present case is over two-years old and near the end of the pre-trial stage. Multiple motions to amend have been filed and decided; many claims and parties have been dismissed after numerous rounds of screening and motions. Now, without explanation or justification, Plaintiff essentially asks for a mulligan so that the case can begin anew: His proposed complaint at least matches, if not surpasses, the scope and breadth of the present one. While he drops a few claims that have already fizzled, he resurrects others that were denied on the merits. And he lumps in new claims and new parties that he must have known about before he filed the original complaint.

It appears, for example, Plaintiff wants to revive his Eighth Amendment claim against Defendant Lacross for conducting the anal cavity search. (R. 72, at PageID.479, 481-482, 489.) But as I explained in my subsequently adopted Report from January 2018, the allegations in the current complaint—which are not materially different from those in the new proposed complaint—do not state a constitutional claim. (R. 21, PageID.110-111.) They still do not. And had Plaintiff intended to remedy this flaw, he could have done so any time after March 28, 2018, when the Report was adopted. (R. 23.) Because he tarried

13

so long, and the claim would be headed for certain dismissal, *i.e.*, it is futile, this relic from the original complaint should not be reintroduced into the case.

He also slaps a Fourth Amendment claim on the same strip search. But this argument was available to him when he filed his first complaint. To let him raise it for the first time now would require dragging Lacross back into the case over a year after his dismissal to relitigate events that were known to all the first time around under a theory that was available at the start of the case. Such a course would be prejudicial. *See George*, 641 F.3d at 791; *Duggins*, 195 F.3d at 834.

The proposed complaint also seems to bring back to life claims against Eagle and Magipora concerning that strip search at Tri-Cap. (R. 72, at PageID.476.) The basis for that claim is the unconstitutionality of the search. But as noted, that basis had been rejected in March 2018 when the allegations about the search were deemed not to have stated a claim. For similar reasons, Plaintiff's current attempt to haul Burgess into the case to answer for the strip search is also misguided. (R. 72, at PageID.479, 481-482.) Burgess had been dismissed in January 2019 because the complaint did not allege he "personally participated in any constitutional violation or enforced an unconstitutional strip-search policy." (R. 53, at PageID.327.) The proposed complaint now adds how Burgess participated, but these allegations do nothing to make the same search unconstitutional. As such, these attempted amendments would be futile.

It appears that the proposed complaint also levies new claims against Magipora and Burgess. The former is said to have forced Plaintiff to attend New Paths, while the latter

14

retaliated against Plaintiff by kicking his group therapist out for encouraging the call to the cops regarding the strip search. (R. 72, at PageID.483-484.) This all should have been old news to Plaintiff, who could have presented these allegations at the start of the case. (R. 72, at PageID.484.)

Other parties would likewise be dragooned back into the case to face new claims. Ervin and Nadzan appear in the present complaint, but they were dismissed because the pleading did little more than name them as Defendants without stating what they did to merit that title. (R. 21, at PageID.109.) In an apparent attempt to remedy this deficiency, the proposed complaint sketches some of Ervin's and Nadzan's misdeeds. (R. 72, PageID.473, 477-478, 480-481.) But these allegations, like the rest of the new material, could have been made earlier than now—and, if not, Plaintiff has had more than enough time to tell the Court why. He could have explained any need for further discovery when my Report recommended dismissing these Defendants. Or he might have told the Court in this motion to amend if he had only recently discovered their true roles in his ordeal. Instead, over a year has passed since they were dismissed. Dragging them back now is no doubt prejudicial.

Similarly, Mitchell and Lewis were earlier dismissed because the present complaint failed to state any claims against them. (R. 53, at PageID.332; R. 60.) Mitchell had been charged with impeding Plaintiff's access to the courts, although how she did so was never clear; neither were the allegations against Lewis. Now, if Plaintiff's amendments were permitted, these individuals would return to answer Due Process and First Amendment

retaliation claims (R. 72, at PageID.489) over events—Plaintiff's punishments and his social media postings—that the present complaint already discusses but not clearly in reference to either Mitchell or Lewis. (R. 25, at PageID.142-144.)[2]

It is true that Mitchell and Lewis exited the case just this past January, (R. 60), and consequently Plaintiff's present motion might appear to be timelier as to them. But their dismissal emanated from defects that Court had already explained to Plaintiff: the January 2018 Report noted that in 42 U.S.C. § 1983 actions, the complaint must plead that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." (R. 21, at PageID.108 (citation omitted).) The failure to do so was, at base, the reason Plaintiff's claims against these Defendants were dismissed. (R. 53, PageID.332; R. 59, at PageID.405.) Thus, even though these Defendants were dismissed recently, the problems should have been apparent long before.

Indeed, even Plaintiff's truly new allegations could easily have been included in his first complaint, over two years ago. At that time, he must have known that Hicks, a new party introduced in the proposed complaint, played a role in keeping Plaintiff in Open Doors. (R. 72, at PageID.475.) There is no inkling in any of Plaintiff's filings that he simply

---

[2] Plaintiff's present complaint merely mentioned that Mitchell informed Magipora that Plaintiff had been cut from New Paths. (R. 25, at PageID.143, 151.) At one point, the complaint stated that termination was "based off" a Facebook posting, but later the complaint clarified that Mitchell told Magipora the termination was because, among other things, he had accessed the Internet, including Facebook, and that the retaliation was for Plaintiff's "complaints about no access to law library." (*Id.*) Thus, the complaint never states that Mitchell took any adverse action due to Plaintiff's speech—a required element in a First Amendment retaliation claim, *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)—other than to convey a decision made by unknown persons based, in part, on Plaintiff's access to the law library.

did not know Hicks's identity, or the identity of any new parties, and the amendments simply substitute Hicks for unnamed persons mentioned in the present complaint.

Plaintiff must also have been aware early on that the harassment and privations he suffered at the cemetery came at the hands of Nick and Warren. It is not clear what type of claim Plaintiff means to assert for the gibes or the allegation that he was forced to drive despite lacking a license. His ADA claim, too, should have been apparent to him in 2017 when he brought this action. And like the allegations against Nick and Warren, the nature of the claim is obscure. Does he mean to say that his mental conditions constitute a disability, and that being forced to work at the cemetery amounted to discrimination due to that disability? *Cf. Tucker v. Tennessee,* 539 F.3d 526, 532-33 (6th Cir. 2008), *overruled in part by Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n. 1 (6th Cir. 2015) (establishing the elements for an ADA discrimination claim). Even if these allegations, and those against Nick and Warren are enough to state cognizable claims, their murkiness makes it that much more prejudicial to permit Plaintiff to raise them after such a long delay.

The same goes for his allegations against two other new parties, "Ms. Rodrigues" and "Mr. Jones." The former confiscated his phone. (R. 72, PageID.486.) That is the only act she is accused of in the new complaint, apart from a conclusory statement that she retaliated against him in violation of his First Amendment rights. (R. 72, PageID.489.) The only thing the complaint says about Jones is that he worked at New Paths and retaliated against Plaintiff or deprived him of due process or both. (R. 72, at PageID.474, 487, 489.) The allegations against Rodrigues and Jones flirt with futility for failing to state a claim.

17

*See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). But assuming that properly-stated claims could be divined from these sparse lines, the amendment still should not be granted because of the prejudice caused by their tardy appearance.

The effect of the amendments would be to vastly expand the scope of a case nearing its endpoint. The prejudice this would cause is clear. At this point, the discovery period has passed. While Plaintiff filed his motion before that point, he was so close to the end that allowing a full briefing schedule assured that the Court could not rule until after discovery had closed. E.D. Mich. LR 7.1(e)(2). *See George*, 641 F.3d at 791. Indeed, Plaintiff has asked to extend discovery (R. 73) apparently in anticipation of his motion to amend being granted. Moreover, since Plaintiff filed the case more than two years ago, three rounds of screening have occurred, (R. 23, 53, 59), and multiple parties have filed dispositive motions, (R. 35, 50), which have been addressed and resolved. Various Defendants who have already been dismissed from the case—some, over a year ago—would be pulled into the litigation once again if Plaintiff's motion were granted. Defendants who have remained involved would need to reconstruct their defenses to meet Plaintiff's reconceived claims. New parties, too, would need to develop evidence and defenses for the first time. In short, discovery would be extended and the Court could expect a new deluge of dispositive motions.[3]

---

[3] It is true that one current Defendant, William Raleigh, was just served process and will need some time to file an answer or dispositive motion or conduct discovery. (R. 74.) But the current claim against him—that he forced Plaintiff to stay at Open Door, (R. 25, at PageID.134)—is hardly complex and likely will not extend proceedings.

18

For these reasons, I suggest that the delayed amendment here would cause sufficient prejudice that Plaintiff's motion to amend should be denied. And, in any event, the Eighth Amendment claims regarding the strip search at Tri-Cap have already been decided against Plaintiff; because his amendments add no new material allegations to that episode, they should be denied as futile.

### 2. Motion for Extension of Discovery

A few days after filing his motion to amend, Plaintiff requested an extension of the discovery deadline. His full explanation was as follows:

> For the following, reasons, I Randy Veeder 244093 had been in segregation at this facility, I have been unable to have access to my legal work, and access to law library, until just recently after seg. and I was moved to level 4, from level 2. Also because of my recent motion for leave of court to amend the complaint, Plaintiff has filed with the court clerk. [*sic* throughout]

(R. 73, at PageID.494.) Defendants have not responded.[4]

Generally, Fed. R. Civ. P. 16(b) requires courts to issue scheduling orders setting deadlines for specific events. The Rule permits modification "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). But courts are allowed to exempt classes of cases from the Rule's strictures, and our District has removed "all actions in which one of the parties appears pro se and is incarcerated" unless the judge orders otherwise. E.D. Mich. LR 16.1(e). The present case fits that bill: Plaintiff is a *pro se* prisoner. Consequently, this matter is not governed by Fed. R. Civ. P. 16(b).

---

[4] While I could have disposed of this request by order, 28 U.S.C. § 636(b)(1)(A), it is better addressed together with Plaintiff's motion to amend because I recommend denial of that motion due in part to the closure of discovery.

19

While the Local Rule exempts this case from Rule 16(b), and thus presumably from the "good cause" requirement for modifications, it offers no alternative standard for deciding motions to modify. But under any reasonably conceivable standard—even those demanding much less from the movant than a showing of "good cause"—I would recommend rejecting Plaintiff's request. For one thing, it is premised in part on his motion to amend. But because that motion should be denied, there is much less need for additional discovery. Further, although his stint in segregation might in certain circumstances justify an extension, he has not presented any argument or evidence that such is the case here. For example, he does not say when or for how long he was stuck in segregation. The scheduling order that established the discovery timeline was issued on February 1, 2019. (R. 66.) Since then Plaintiff has filed multiple documents, (R. 69, 72, 73), without apparent difficulty. And he does not say what discovery the segregation prevented and what discovery he still needs to complete. Finally, it is unclear why his move to "level 4, from level 2" matters.

As such, whatever standard might apply, Plaintiff's request for an extension should be denied.

## III.    Conclusion

In light of the above analysis, I recommend **DENYING** Plaintiff's motion for leave to amend his complaint, (R. 72), and **DENYING** Plaintiff's request to extend discovery, (R. 73).

## IV.   <u>Review</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 7, 2019                    S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge


## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.  A copy was also sent via First Class Mail to Randy Veeder #244093 at Saginaw Correctional Facility, 9625 Pierce Road, Freeland, MI 49623.

Date: June 7, 2019                     By s/Kristen Castaneda
                                       Case Manager