## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RANDY VEEDER,

        *Plaintiff*,

*v.*

CASE NO. 17-cv-11690

DISTRICT JUDGE TERRENCE G. BERG

MAGISTRATE JUDGE PATRICIA T. MORRIS

TRI-CAP, SANDRA EAGLE,
BRIAN MAGIPORA,[1]
OPEN DOOR, NEW PATHS, INC.,
and WILLIAM RALEIGH,

        *Defendants*.

_____/

## REPORT AND RECOMMENDATION on MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 84, 87, 90, 92 )

### I.    Introduction

On May 22, 2017, Plaintiff Randy Veeder filed this pro se action against the above Defendants and others since dismissed from the case. (Doc. 1). Currently before the Court are four motions for summary judgment. (ECF Nos. 84, 87, 90, 92). For the reasons that follow, I **RECOMMEND GRANTING** all four motions and also *sua sponte* **DISMISSING** under 28 U.S.C. § 1915(e)(2)(B) any First Amendment denial-of-court-access claim against Defendants Mangapora and Eagle.

### II.    Report

#### A.    Facts and Procedural History

---

[1] The docket shows Brian "Magipora" as a defendant, but the brief he submits and the documentary evidence shows the spelling as "Mangapora." In this Report, I use the latter (and presumably correct) spelling.

1

On May 22, 2017, Plaintiff filed his initial complaint. Over the course of the next six months, he made four motions to amend his complaint. (Docs. 9, 13, 15, 19). On January 2, 2018, the Court granted his most recent motion to amend, (Docs. 19, 20), and thus his proposed amended complaint supplanted his initial complaint. *See* (Doc. 25). His other motions to amend were then dismissed as moot. (Doc. 20).

Plaintiff's complaint levies accusations of numerous civil rights violations, beginning in July 2015 in Midland County. (Doc. 25). There, he contends, his parole agent, defendant Sandra Eagle and her supervisor, defendant William Raleigh, "forced [Plaintiff] to reside at the Open Door . . . a homeless shelter that is run by a church in Midland." (*Id.* at PageID.134). His parole agreement, signed July 15, 2015, did not mandate that he stay at Open Door; rather, its provision on housing stated that he "must not change residence without prior permission of the field agent." (ECF No. 84 at PageID.605). It also stated that Plaintiff had to "comply . . . with written or verbal orders made by the field agent." (*Id.*) Plaintiff testified that Eagle required him to stay at Open Door until he could find another residence she would approve. (ECF No. 87 at PageID.698-699). Eagle says she "referred him to Open Door as a possible residence," but that it was not a parole condition. (ECF No. 84 at PageID.608-609).

According to an affidavit from Renee Pettinger, the executive director of Open Door, the program "is a private, non-profit religiously affiliated organization that provides shelter, food, and clothing to less fortunate and vulnerable individuals." (ECF No. 87 at PageID.715). Pettinger also stated that Open Door was not affiliated with the state of Michigan, did not receive remuneration from the state to house parolees, did not have an

ongoing contractual or other arrangement to house parolees, and would not contact the state if a parolee left, although it would "provide information to a parole agent within the bounds of an executed authorization, if said parole agent inquires." (ECF No. 87 at PageID.716).

Plaintiff's complaint states that Open Door forced its residents to "wake up and attend prayer every morning, also Tuesday night meeting, religious speaker, coffe[e] house every month, and attend church on Sundays." (ECF No. 25 at PageID.134). Plaintiff asserts that "Corrections employee[s were] constantly trying to force the Plaintiff to 'choose a religion' or force the Plaintiff into some kind of faith-based program or housing." (*Id.* at PageID.134-135). Included in the record is a copy of Open Door's rules, signed by Plaintiff on July 15, 2015, that states he was required to attend prayer meetings, abide by a curfew, and attend a church of his choice, among other things. (ECF No. 87 at PageID.709).

Plaintiff testified that he left Open Door on July 19, 2015, and did not return by curfew, resulting in a parole violation and jail time. (ECF No. 87 at PageID.697). Plaintiff then returned to Open Door on July 29, 2015. (ECF No. 87 at PageID.703-706). In the intake paperwork, he wrote that he was referred to the program by "Self." (ECF No. 87 at PageID.703). He again signed a copy of Open Door's rules. (ECF No. 87 at PageID.711). Plaintiff testified that in August 2015, Eagle granted his request to move out of Open Door. (ECF No. 87 at PageID.697).Plaintiff's complaint alleges that his placement at Open Door violated his First Amendments by coercing participation in religious programming. (ECF No. 25 at PageID.134).

Plaintiff was subsequently convicted of other offenses in 2016. (ECF No. 90 at PageID.832-833). In a Probation Order dated January 19, 2017, Judge Michael J. Beale

ordered Plaintiff to "enter and successfully complete the Tri Cap RWP Program. [Plaintiff] is to be released from the Midland County Jail on 1-18-2017 to Tri Cap custody." (ECF No. 90 at PageID.758, 760, 762). The court order named defendant Brian Mangapora as the probation officer. (ECF No. 90 at PageID.757, 759, 761).

According to an affidavit from Gary Davis, TRI-CAP's executive director, "[n]either the courts nor the Michigan Department of Corrections [MDOC] are involved in the daily activities of TRI-CAP, and do not direct the programming offered by TRI-CAP to individuals who stay at TRI-CAP as part of their probation or parole." (ECF No. 90 at PageID.817).

Plaintiff's amended complaint alleges that Mangapora and Eagle forced him to enter and complete the TRI-CAP program. (ECF No. 25 at PageID.135). He claims that while there he was "forced to attend a faith based," church-run program called "RU" to meet a weekly hours requirement. (ECF No. 25 at PageID.136). Failure to meet the requirement would allegedly have resulted in a write up, termination from the program, a probation or parole violation, and jail or prison time. (*Id.*).

While Plaintiff was a resident at TRI-CAP, he alleges, Eagle and Mangapora "forced" him to participate in a program that put him to work in a Saginaw cemetery. (*Id.* at PageID.135). He describes working outside in winter without proper food or clothing, and also complains that he had to work as a pall bearer and "acknowledge and participate with Mangapora from family's church, pastor and prayer." (*Id.* at PageID.135-136). He claims that Mangapora and Eagle were also aware of Plaintiff's complaints about TRI-CAP and "ignored" his request for a pass to access legal materials or "to talk to a[n]

attorney to make a complaint." (*Id.* at PageID.140). According to the complaint, Mangapora informed Plaintiff that if he was uncomfortable being at TRI-CAP, he could move Plaintiff to New Paths, but that Plaintiff would have to start over with no credit for the time he had spent at TRI-CAP. (*Id.*). Plaintiff's complaint alleges that his placement at TRI-CAP violated his First Amendment rights. (ECF No. 25 at PageID.136).[2]

On April 20, 2017, Plaintiff absconded from TRI-CAP and was arrested and sentenced to 30 days in jail. (*Id.* at PageID.141). On June 1, 2017, Plaintiff's Probation Order was amended by Judge Stephen P. Carras, adding a new condition signed by Mangapora: "The defendant must enter and successfully complete New Paths SUD Program. Defendant is to be remanded until bed is available and released to the custody of New Paths staff." (ECF No. 92 at PageID.911-913).

An unsigned "Service Agreement" was completed on June 12, 2017. (*Id.* at PageID.951). New Paths' brief indicates that the Agreement was "executed" by Mangapora, whose name was typed on the agreement. (*Id.* at PageID.887, 951). The Agreement provided instructions and terms of Plaintiff's stay. Included were that New Paths would send Mangapora monthly updates and notices of program violations; that Plaintiff was to receive substance abuse treatment and Substance Abuse Disorder (SUD) programing; that he could leave the facility for substance abuse treatment; and that he could not have access to a cell phone or the internet. (*Id.* at PageID.951-952). New Paths'

---

[2] A significant portion of the Amended Complaint revolves around an alleged sexual assault that occurred during a strip search at TRI-CAP on February 17, 2017, as Plaintiff and others returned from work. (ECF No. 25 at PageID.137). Claims involving the strip search have been dismissed. *See generally* (ECF No. 59 at PageID.390 & n.4).

executive director, James Hudgens, provided an affidavit stating that the SUD program required patients to be "confined to the New Paths' facility for the initial sixty (60) days of the program." (*Id.* at PageID.932).

New Paths attaches to its brief various reports it gave Mangapora, many of which indicated Plaintiff committed infractions or failed to attend programing. (*Id.* at PageID.958, 960). A report from August 9, 2017, stated that Plaintiff had been terminated after 60 days due to his lack of participation. (*Id.* at PageID.962).

Plaintiff makes several allegations of civil rights violations that occurred at New Paths. First, he asserts his due process rights were violated when, after he took items from an open vending machine, New Paths staff made him "restart the SUD program" without issuing him a write-up or providing a hearing. (ECF No. 25 at PageID.142, 150). At his deposition, he testified that he was denied a hearing to "refute" the allegations, (ECF No. 90 at PageID.772), but he admitted that he had taken the candy and was "guilty . . . for participating." (*Id.* at PageID.786).

Second, Plaintiff alleges that he described his complaints about TRI-CAP to his caseworker, Mitchell, and said that he needed access to legal materials, to which Mitchell responded that "he would not be allowed to have any access to any legal materials or . . . a pass for that purpose." (ECF No. 25 at PageID.141-142). According to Plaintiff, this violated his First Amendment right to access the courts. (*Id.*)

Third, Plaintiff argues his First Amendment rights were violated when Mitchell "and staff" terminated him from New Paths for making a Facebook post from his cell phone about the "poor conditions of living" at the facility. (*Id.* at PageID.143, 151). Additionally,

6

he says that his due process rights were violated because he had no chance to challenge the violation and no notice of hearing regarding the termination. This is despite the fact, according to Plaintiff, that "[r]esidents at New Paths Inc. are allowed to have cell phones outside in the lockbox," and there are "no rules against having internet or social networking." (*Id.* at PageID.142).

Plaintiff's application to proceed without prepayment of fees was granted pursuant to the *in forma pauperis* statute, 28 U.S.C. § 1915(a)(1). (Doc. 11). After screening the *pro se* complaint under 28 U.S.C. § 1915(e)(2)(B), I recommended dismissing Plaintiff's claims against various defendants, (Doc. 21); the Court adopted my recommendation on March 28, 2018, (Doc. 23).

On May 2, 2018, Burgess and Tri-Cap filed a Motion to Dismiss. (Doc. 35). Plaintiff responded on May 31, 2018. In a Report and Recommendation on July 27, 2018, I recommended granting the motion in part and, additionally, dismissing other defendants from the suit. (Doc. 53). That recommendation was subsequently adopted. (ECF No. 60).

In yet another Report and Recommendation, I recommended dismissing all claims against Eagle and Mangapora involving an alleged sexual assault at TRI-CAP and the claims against Mangapora concerning Open Door; I recommended denying Eagle's motion for summary judgment on claims relating to the religions programming at Open Door.

(ECF No. 50). The Court adopted this recommendation on January 15, 2019. (ECF No. 60).[3]

**B.      Law and Analysis**

Before the Court are four motions for summary judgment. (ECF Nos 84, 87, 90, 92). I begin below with the dispositive arguments from the three entities—Open Door, Tri-Cap, and New Paths—because they revolve around the same issue: whether these entities engaged in state action necessary for suit under 42 U.S.C. § 1983. I will then turn to the fourth motion, by defendants Eagle, Mangapora, and Raleigh. Plaintiff has not responded to any of these motions despite being granted three extensions of time. (ECF No. 98.)

**1.  Summary Judgment Standards**

When a movant shows that "no genuine dispute as to any material fact" exists, the court will grant his or her motion for summary judgment. Fed. R. Civ. P. 56(a). In reviewing such motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*,

---

[3] The most recent Report and Recommendation involved Plaintiff's motions to amend his complaint and extend discovery, both of which were denied when the Court adopted my Report on July 3, 2019. (ECF Nos. 82, 83).

8

475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493.

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989)

(quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

### 2. Section 1983 and State Action

#### a. Standards

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate facts showing (1) the conduct about which he or she complains was committed by a person acting under color of state law and (2) the conduct deprived him or her of a federal constitutional or statutory right. In addition, a plaintiff must allege that he or she suffered a specific injury because of the conduct of a particular defendant and must allege an affirmative link between the injury and that defendant's conduct. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

Section 1983 does not protect against actions by private individuals. *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). Though acting "under color of state law" is not coterminous with Due Process "state action," they generally meld together and the "under color" requirement is satisfied by showing "state action." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 935 n.18 (1982). Courts can find that private entities engage in state action if the disputed act is "fairly attributable to the State." *Id.* at 937. Multiple tests exist for this inquiry; at base, they all ask whether the state played a significant role in the disputed act. As the Supreme Court has suggested, "these different tests are . . . simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation." *Id.* at 939.

10

The Sixth Circuit generally employs three tests to make the "state action" determination: the state compulsion, nexus, and public function tests. *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). Under the first, the state must exercise coercive power or give overwhelming encouragement to the private entity's action. *Id.* (citing *Wolotsky*, 960 F.2d at 1335). This requires "[m]ore than mere approval or acquiescence in the initiatives of the private party," *Wolotsky*, 960 F.2d at 1335, and more than a state's positive response to a private party's requests for assistance. *See, e.g.*, *Lansing*, 202 F.3d at 829 (holding that no compulsion occurred where "but for [the private actor's] insistence, the city would not have been involved at all").

The public function test "requires that the private entity exercise powers which are traditionally exclusively reserved to the state." *Wolotsky*, 960 F.2d at 1335. The powers granted the private actor must be "traditionally associated with sovereignty." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974). For example, private security guards overseeing rehabilitation of prisoners under a state contract exercise a traditional public function–jailing criminals–and are state actors. *Flint ex rel. Flint v. Kentucky Dep't of Corrections*, 270 F.3d 340, 351-52 (6th Cir. 2001).

Finally, the nexus test examines whether "there is a sufficiently close nexus between the state and the challenged action of the [private] entity." *Wolotsky*, 960 F.2d at 1335. The analysis centers upon the state's involvement in the challenged decision, and courts generally find state action only where the state made the decision or substantially encouraged it. *Id.*; *see also Blum v. Yaretsky*, 457 U.S. 991, 1008 (1982) (finding no state action in nursing home's decision to lower residents' level of care because "[t]hose

11

decisions ultimately turn on medical judgments made by private parties according to professional standards not established by the State"); *Lansing*, 202 F.3d at 831-34 (holding that a festival was not a state actor when it asked a participant to leave because none of the festival's many links to the city related to the disputed speech policy). However, the government must do more than simply rubber stamp a private party's decision. *Wolotsky*, 960 F.2d at 1335 (citing *Blum*, 457 U.S. at 1004).

Under these tests, courts often find that private non-profit entities providing services to parolees and probationers are not state actors. A recent case noted that "courts have consistently held that drug treatment facilities that treat individuals pursuant to a condition of parole are not performing a public function." *Porter v. Game*, 2020 WL 127580, at \*2 (E.D. N.Y. Jan. 9, 2020) (citation omitted). The court similarly found insufficient allegations of state action under the other tests. *Id.*[4]

Courts in the Eastern District have addressed the issue on numerous occasions. In one such case, a condition of the plaintiff's parole was to attend a substance-abuse treatment program. *Range v. Eagan*, 2017 WL 9477693, at \*1 (E.D. Mich. Dec. 6, 2017), *rep. & rec. adopted by* 2018 WL 446450 (E.D. Mich. Jan. 17, 2018). The court dismissed the complaint, noting in general that "courts in this district have routinely and consistently held that CPI's [*i.e.*, this particular private entity's] provision of substance abuse counseling to parolees, pursuant to contract with the MDOC, does not amount to state

---

[4] Some of the cases I discuss were not at the summary-judgment stage but instead at the pleadings stage. These cases are nevertheless relevant because they demonstrate the type of facts that must be in dispute to prove state action.

action." *Id.* at *4. (collecting cases). Going through the relevant tests in dispute, the court stated that substance abuse treatment in these circumstances "cannot plausibly be deemed an exclusive state function." *Id.* at *3 (*quoting Roberts v. Paige*, 2013 WL 5435201, at *6 (E.D. Mich. Sept. 27, 2013)); *Gebreneguesse v. Heyns*, 2017 WL 3405169, at *2 ("[C]ourts of this district have repeatedly declined to hold the addiction counseling services provided by CPI Defendants to be an exclusive state function for the purposes of the public function test."). Under the nexus test, the mere existence of a state contract was insufficient under longstanding Sixth Circuit law to establish state action. *Range*, 2018 WL 446450 at *4 (citing, among other cases, *Partin v. Davis*, 675 F. App'x 575, 587 (6th Cir. 2017)).

The court made similar findings in *Cain v. Caruso*, 2009 WL 2475456 (E.D. Mich. Aug. 11, 2009). The public-function test was unmet because the plaintiff offered no historical evidence demonstrating that the program was a traditional public function. *Id.* at *5. The state-compulsion test failed because the plaintiff failed to argue or allege that the program employee "was coerced or encouraged by the state into committing any of the alleged acts against plaintiff." *Id.* at *6. Finally, under the nexus test, no state action was found despite the government's contract with the program and regulations of it; those factors were not enough to create state action, and the plaintiff presented nothing to show that the state "had any influence or role in the specific actions [the program employee] took." *Id.* at *8.

Similar holdings can be found across the country. *See, e.g.*, *Gross v. Samudio*, 630 F. App'x 772, 773-775, 778-779 (10th Cir. 2015) (a sex-offender treatment center did not engage in state action with regard to the plaintiff, who participated as a condition of parole,

13

when the state exercised no coercive power regarding the center's challenged conduct; the mere contract between the center and the government was insufficient to give rise to state action); *Estate of Schwartz v. Assisted Recovery Cts. Of America, LLC*, 2017 WL 840542, at \*5-9 (E.D. Mo. Mar. 3, 2017) (finding that the caselaw was not favorable to claims of state action based on "services for non-incarcerated persons"; that "serval cases . . . support a conclusion that private businesses which provide services to former inmates (e.g., persons on parole or supervision) are not state actors because such functions/services are not traditionally the exclusive prerogative of the State, and such businesses lack the authority to return the person to prison"; and that even the program's duty to report violations to the state did not "rise to the level of state action"); *Edmond v. Clements*, 96 F. Supp. 2d 960, 965 (D. Colo. 2012) (existence of a contract between the sex treatment facility and the government was not enough to transform the facility into a state actor with regard to its actions involving the parolee); *Moore v. Broady*, 2010 WL 3125008, at \*5-9 (E.D.N.Y. Aug. 6, 2010) (finding no state action because mere contracts with the state to provide services to former inmates were not enough and "the provision of transitional housing to former inmates under parole supervision is not a function that has traditionally been the exclusive prerogative of the state"); *Lovelace v. Oregon*, 2009 WL 2450298, at \*6 (D. Ore. Aug. 10, 2009) (finding no state action when the plaintiff did not show "sufficient cooperation" between the program employee and the parole officers or that the employee was performing a government function in providing treatment and reporting to parole officials).

The same outcome has been reached in cases involving *probationers* who attend substance abuse programs pursuant to probation orders. *See also Estate of Schwartz, LLC*, 2017 WL 840542, at *2, 5-9 (finding no state action when the plaintiff was required to attend a program "as a mandatory condition of his Missouri probation and parole"); *Switzer v. Weaver*, 2013 WL 373471, at *2 (W.D. Va. Jan. 30, 2013) (holding that a private individual providing treatment to a probationer as a probation condition did not become a state actor); *Blair v. Mich. Dep't of Corrections*, 2012 WL 5511763, at *2 (E.D. Mich. Nov. 14, 2012) ("Even assuming that CPI receives state funding and/or creates an opportunity for probationers to complete a substance abuse program in lieu of prosecution or serving a sentence, this does not necessarily make it a state actor."); *Bagwell v. Community Programs, Inc.*, 2011 WL 1447543, at *1 (E.D. Mich. Apr. 13, 2011) (same); *Heilman v. T.W. Ponessa & Assoc.*, 2008 WL 275731, at *11 (M.D. Penn. Jan. 30, 2008) (holding that plaintiff's attendance at a private treatment program as a condition of probation did not transform the program into a state actor).

These holdings apply to entities *housing* parolees, either as a condition of parole or by the plaintiff's choice. As one decision states, "Courts have consistently held that the provision of transitional housing to former inmates under parole supervision is not a function that has traditionally been the exclusive prerogative of the state." *Byng v. Delta Recovery Servs., LLC*, 2013 WL 3897485, at *9 (N.D.N.Y. July 29, 2013). The fact that the plaintiff could leave the facility on his own volition also factored into the decision. *Id.* That he might have been "forced to reside at [the private housing] and participate in their treatment programs, such as a requirement as a condition of parole, without more, does not

15

create state action for purposes of section 1983 on the part of the residential facility providing the treatment." *Id.* at *8.

In *Smith v. Devline*, the plaintiff was paroled to a residential treatment center, which he subsequently sued. 239 F. App'x 735, 736 (3d Cir. 2007). The Third Circuit upheld the decision that no state action was involved. *Id.* In doing so, the court noted that the defendant had contracts with the government but was governed by an independent board of trustees, that it developed its own policies and procedures, that the government could not force it to accept patients, and that it could merely notify the government when a person violated program rules but could not order the person back to prison. *Id.*

Another example is *Merill v. Mental Health Systems*, in which the plaintiff sued both a mental health program his parole conditions required him to attend and a non-profit residential treatment program where he stayed. 2016 WL 4761789, at *1 (S.D. Cal. Sept. 13, 2016). The plaintiff's suit involved allegations that the housing had bedbugs and the mental health program terminated him for his complaints. *Id.* at *2. Employing the same three tests used in the Sixth Circuit, the court held that there was no state compulsion with regard to the defendants' handling of the bedbugs, as there was no allegation that the state directed or significantly encouraged the defendants' relevant actions. *Id.* at *4. Regarding the public function test, the court noted that the state did not delegate traditional governmental functions to the defendants. *Id.* It stated that "federal courts have held that privately-operated halfway houses are not state actors for purposes of § 1983 claims." *Id.* at *4 n.2. Finally, the court rejected finding a nexus based on the state's authorization to

the defendants "to coordinate and provide substance abuse treatment" even though the defendants could threaten parole revocation. *Id.* at \*5.

Many other courts have similarly rejected state action in these circumstances, finding that parole-based residence at a private treatment program is not state compulsion, a traditional public function, or a sufficient nexus between the state and a private entity. *See Melvin v. Connecticut*, 2017 WL 3841689, at \*3-4 (D. Conn. Sept. 1, 2017) (finding no compulsion because the state did not control the program even when the plaintiff was ordered to attend; finding that such programs to not provide a traditional state function; and finding no nexus with the alleged conduct because the plaintiff did "not allege that any state actor directed or encouraged the alleged violations or that [the program's] employees were acting pursuant to state policies"); *Murray v. N.Y. City Dep't of Corrections*, 2016 WL 11395007, at \*10 (E.D.N.Y. Aug. 18, 2016) ("The defendant drug treatment organizations, transitional housing facilities, and the employees who work for them are not considered state actors under section 1983."); *Kelly v. N.J. Dep't of Corrections*, 2012 WL 6203691, at \*6-7 (D. N.J. Dec. 11, 2012) (finding that the plaintiff failed to allege facts indicating that the program functioned as a state actor or that the state encouraged the conduct at issue); *cf. Vaughn v. Phoenix House Programs of N.Y.*, 2015 WL 5671902 (S.D.N.Y. Sept. 25, 2015) (collecting cases and finding no state action when the plaintiff agreed to enter the in-patient treatment program as an alternative to incarceration because the state did not direct his treatment, the program was not a public function, and the program had no role in the criminal proceedings); *Justice v. King*, 2015 WL 1433303, at \*17-18 (W.D.N.Y. Mar. 27, 2015) (same).

17

The results have been the same in the context of probation. In *Lindon v. Cuyahoga Co. Common Pleas Court Probation Dep't*, the plaintiff was ordered as a term of probation to complete in-patient drug treatment, and a program was subsequently chosen which he claimed was religious-based. 2019 WL 487804, at *1 (N.D. Ohio Feb. 8, 2019). Collecting caselaw, the court held that the plaintiff's claim failed because he did not allege facts showing the program to be a state actor. *Id.* at *4.

In another case, the plaintiff's probation order required him to attend inpatient substance abuse treatment at a treatment facility licensed and partly funded by the state, although no governmental funds or contracts existed specifically regarding probationers and the state had no influence over the program's content. *Rose v. Flairty*, 2013 WL 12075566, at *1-2 (D. Neb. Sept. 3, 2013). The court found that the program was not a state actor despite the court order requiring the plaintiff to attend; no evidence established that the program's challenged decisions were "made on the basis of some rule of decision for which the State is responsible." *Id.* at *5 (*quoting West v. Atkins*, 487 U.S. 42, 52 n.10 (1988)). The fact that the state might have approved or acquiesced in a program's decision was not enough to demonstrate state action. *Id.* Further, the court noted that the state had no authority to place probationers in the program but could merely refer people whom the program could refuse to accept; nor did the state dictate the content or terms of the treatment program. *Id.* at *6.

A few cases find certain treatment programs to be state actors. *See Kelly*, 2012 WL 6203691, at *6 (noting the split on "whether organizations that operate halfway houses, and their employees, are state actors for purposes of § 1983," but finding no state action).

18

Many are distinguishable from the cases above because the programs at issue housed and confined prisoners still considered to be inmates. Thus, they were akin to private prisons. One such case involved a private "residential work-release program," which the court said "performs the state function of incarcerating prisoners." *Braswell v. Community Solutions, Inc.*, 2013 WL 663621, at *4 (D. Conn. Feb. 4, 2013). There, however, the program received inmates, still within state custody, for the purpose of supervising and treating them. *Id.*; *see also McBryde v. Thomas*, 2013 WL 6199177, at *4-5 (D. Mont. Nov. 27, 2013) (finding that a residential treatment program performed a state function when it received inmates, who signed a document acknowledging they were inmates, and who could not leave, would be charged with a 10-year felony if they escaped, and could be placed back in prison).

One case that is not as easy to distinguish from the decisions finding no state action is *Hanas v. Inner City Christian Outreach, Inc.*, 542 F. Supp. 2d 683, 694 (E.D. Mich. 2008). There, the court held that a drug program that served as an alternative for incarceration was a state actor because the judge assigning the plaintiff there told him that the program's rules were the court's rules; alternatively, *Hanas* held that the program gave the court a source of referrals for the court, thus creating a symbiotic relationship. *Id.* Subsequently, another court has distinguished *Hanas* on the ground that the plaintiff there was in custody, apparently because the program was a residential treatment center entered in lieu of prison. *Range*, 2017 WL 9477693, at *4 n.5.

*Hanas* is perhaps different from the apparent majority position described above (finding no state action) in that the judge ordering probation directly endorsed the program

by suggesting that its rules were backed by the court. That endorsement, missing from the caselaw above, might constitute sufficient entwinement with the state to make the program a state actor. Another possible distinction is the implication in *Hanas* that the program's practical existence was to serve a governmental need; this could be due to the quantity of referrals it received from the government compared to other sources.

However, a steady stream of refusable referrals from a court does not endow a program with governmental authority or place the state's imprimatur on the program's every action. As the cases above demonstrate, even a contract with the state to provide for parolee treatment does not transform a program into a state actor. Moreover, the nexus analysis is keyed to the challenged conduct, so the court must determine that conduct's relationship to the state, *e.g.*, whether the state authorized or compelled that conduct. *See Cain*, 2009 WL 2475456, at *7 ("Importantly, it should also be remembered that for this state-action test to be satisfied, the required nexus must be found between the specific complained-of actions of the private actor and the involvement or influence of the State."). The state-compulsion test similarly looks to the state's role in the disputed "decisions or actions of the private actor." *Id.* at *6. Thus, general entwinement with the state is not enough.

### b.  Application

The following examines each of the three state-action tests in turn, grouping each defendant under each test. Beginning with the public-function test, Plaintiff has made no allegation nor provided any evidence or authority suggesting that the services rendered by any of these defendants constitute a traditional public function. Each provided Plaintiff

20

with housing or substance-abuse treatment, which the caselaw above establishes is not a traditional public function. The strongest argument for finding such a function would be that, under *Hanas*, TRI-CAP and New Paths served as an alternative for incarceration. But this position cuts against the more numerous courts that find attendance at a program as a probation condition does not transform the program into a state actor. *See Rose*, 2013 WL 12075566, at *5-6; *Blair*, 2012 WL 5511763, at *2. This view makes sense when, as here, there is no indication that any physical confinement at the program related to penological motives or the plaintiff's status as an inmate rather than treatment purposes. *Cf. Braswell*, 2013 WL 663621, at *4. Thus, I would not find that any of these defendants served a public function by confining or incarcerating Plaintiff in lieu of his serving a sentence in prison.

Regarding the compulsion test, Plaintiff has presented no evidence that the state compelled any of the actions he challenges. The state did not order him to attend Open Door. The only record evidence of the state's involvement with Open Door comes from Pettinger's affidavit, which indicates that the state had no role in creating the program, no contracts with the program regarding the housing of parolees, and would not even be contacted by the program unless authorized and upon inquiry. (ECF No. 87 at PageID.716). There is no evidence that the state compelled Open Door to provide the religious programming that Plaintiff claims violated his First Amendment rights. The closest he comes to such a showing is his testimony that when he presented Eagle with the religious components of Open Door, she smiled and said "it's good for you." (ECF No. 90 at PageID.771). At best, this shows "mere approval or acquiescence in the initiatives of the private party"—here, an approval or acquiescence that was not communicated to the

21

private party—which is insufficient to establish state action. *Wolotsky*, 960 F.2d at 1335. Thus, Plaintiff has not presented a question of material fact regarding whether Open Door became a state actor under the state-compulsion test.

The same is true of TRI-CAP. Plaintiff has offered no evidence on its relationship with the state. The only relevant records, then, show that although he was ordered to attend TRI-CAP, (ECF No. 90 at PageID.758, 760, 762), its director averred that neither the courts nor the MDOC directed the programming offered to probationers or parolees. (ECF No. 90 at PageID.817). Plaintiff again asserts, in his amended complaint, that Mangapora and Eagle were aware of his complaints, a fact which would not prove state compulsion. *Wolotsky*, 960 F.2d at 1335.

Plaintiff's complaint also alleges that Mangapora forced him into the TRI-CAP work program and Plaintiff testified that the Judge stated Mangapora "put[] all the rules and conditions as far as treatment" at TRI-CAP." (ECF No. 90 at PageID.773). These assertions do not create a material issue of fact. For one thing, even if Mangapora arranged for him to enter the work program, that would not be evidence that the state forced TRI-CAP to place him in the program. And even if such compulsion could be established, it would not constitute evidence that Mangapora or the state knew of or somehow compelled TRI-CAP to implement the religious aspects of the work program to which Plaintiff objects. As for Plaintiff's testimony about the Judge's statements, even if not hearsay, they do not show that the state directed the program content, which was not in the court's order. *See McDaniel v. Bechard*, 2020 WL 289307, at *3 (E.D. Mich. Jan. 21, 2020) (hearsay "cannot be considered by a trial court ruling on a motion for summary judgment" (*quoting*

22

*Tinsley v. Gen. Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000))). Consequently, I find no triable issue regarding whether TRI-CAP was a state actor under the compulsion test.

The issue is slightly closer with regard to New Paths because some of the challenged conduct was loosely related to the Service Agreement bearing Mangapora's name and dated after Plaintiff was ordered to attend. In particular, the Agreement indicated that Plaintiff should not have access to a cell phone or the internet and he claims that he was terminated in retaliation for making Facebook posts from his cell phone. (ECF No. 25 at PageID.141-142; ECF No. 92 at PageID.951-952).

These links are not enough, however, to show compulsion. To begin, there is no evidence that the Agreement, or even Plaintiff's placement at New Paths, resulted from coercion by the state. Nothing suggests that New Paths was required to accept Plaintiff as a patient or to submit to the terms of the Agreement (indeed, the nature of an "agreement" is that the parties mutually consent, *Oxford English Dictionary* (Online ed.)). And even if Plaintiff and the agreement were forced upon New Paths, there is insufficient connection between the coercion and the program's disputed actions. A rule that Plaintiff could not have his cell phone or the internet is not the same as a rule requiring New Paths to retaliate against Plaintiff if he obtains both and uses them to disparage the program. Therefore, I conclude that no triable issue has been raised.

For many of the same reasons as above, Plaintiff has offered no evidence demonstrating that either Open Door or TRI-CAP was sufficiently entwined with the state to render them state actors under the nexus test. There is nothing in the record demonstrating that either defendant received funding from the state, had contracts with the

23

state, or was heavily regulated by the state. As noted, the only evidence on these matters is Pettinger's statement that Open Door did not have a state contract regarding parolees and Davis's statement that the state did not control program content at TRI-CAP. (ECF No. 87 at PageID.716; ECF No. 90 at PageID.817). Nor does any evidence show that the state had any links to the challenged acts, *i.e.*, the defendants' religious programming. Also, Plaintiff testified that Mangapora's and Eagle's only roles in TRIC-CAP were referring parolees to the program, following through with the Judge's order, and establishing the timeframe. (ECF No. 90 at PageID.774). Consequently, no issue of material fact exists regarding whether either defendant was a state actor under the nexus test.

The question is again somewhat closer with regard to New Paths. Plaintiff was confined there in lieu of imprisonment and Mangapora played some role in the ban on cell phones and internet, which in turn has some attenuated relationship to his claim regarding First Amendment retaliation. But the connections are too faint to attribute anything the state did to any of New Paths' challenged conduct. True, the Service Agreement demonstrates that the state (via Mangapora) had some input on the terms of Plaintiff's stay at New Paths. It does not establish, however, the state's role in terminating Plaintiff from the program for posting online negative comments about New Paths. Nor did the Agreement relate to New Paths' policy of confining patients in the first 60 days, to New Paths' denial of Plaintiff's requests for legal materials, or to the alleged lack of process they afforded him in disciplinary actions. In addition, no evidence has been presented regarding any other connections between the state and New Paths. Also influencing my conclusion is Plaintiff's failure to respond to any of defendants' motions for summary

24

judgment, despite multiple extensions of time for him to do so. *See Guarino*, 980 F.2d at 404; *Street*, 886 F.2d at 1479-80. Given the lack of argument and the lack of evidence that the state is entangled with New Paths or had any role in its challenged conduct, I cannot conclude that Plaintiff has presented a triable issue.

Because Open Door, TRI-CAP, and New Paths were not state actors, their motions for summary judgment should be granted.[5]

### 3. Mangapora, Eagle, and Raleigh's Motion for Summary Judgment

Defendants Mangapora, Eagle, and Raleigh have also moved for summary judgment. (ECF No. 84). They argue that Raleigh should be dismissed because there is no evidence of his personal involvement in any of the challenged actions. (ECF No. 84 at PageID.587-589). They also argue that Plaintiff has not shown a triable First Amendment issue regarding his stay at Open Door because Eagle did not force him to stay there and he made no objections to staying there. (*Id.* at PageID.583-586).[6] Alternatively, they contend that they are entitled to quasi-judicial immunity from the claims involving Open Door and TRI-CAP because the challenged actions involved monitoring and supervising Plaintiff's compliance with parole conditions. (*Id.* at PageID.577-580). As another alternative, they claim qualified immunity. (*Id.* at PageID.589-592).

### a. Raleigh's Personal Involvement

I agree that Raleigh should be dismissed. The individual claims against Raleigh under § 1983 require proof that he was personally involved in the alleged deprivation of

---

[5] And because this conclusion is dispositive, I will not address the defendants' alternative arguments.
[6] The claims against Mangapora concerning Open Door have been dismissed. (ECF No. 59).

rights. *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002); *Herrera v. Michigan Dept. of Corrections*, 2011 WL 3862640, at *9 (E.D. Mich. July 22, 2011) ("[I]n order to state a claim under § 1983 '[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights. Liability under § 1983 must be based on the personal involvement of the defendant.'" (*quoting Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998))). Supervisors cannot be held liable under § 1983 under a *respondeat superior* theory; like other defendants, they must have been personally involved in the violations, at least by implicitly authorizing, approving, or knowingly ratifying a subordinate's conduct. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008).

Raleigh's lone appearance in the complaint comes in Plaintiff's assertion that Eagle "along with Willim Raliegh [*sic*], supervisor of Midland County Parole and Probation forced Randy Veeder to reside at the Open Door." (ECF No. 25 at PageID.134). At Plaintiff's deposition, he was asked about Raleigh's role in the complaint. (ECF No. 90 at PageID.810). He responded, "I feel he violated my rights because through Sandra – I mean my parole officer put the detainer on me . . . for not staying in there and she violated me, and her supervisor is enforcing the – her to enforce the rules." (*Id.*) Was Raleigh's only involvement as a supervisor, Plaintiff was asked; "I would say correct," he replied. (*Id.*)

The complaint lacks any concrete allegations concerning actions Raleigh took[7] and Plaintiff testified that Raleigh's liability stems solely from his status as Eagle's supervisor.

---

[7] The complaint was signed under penalty of perjury, thus allowing it to be used as evidence per 28 U.S.C. § 1746.

Given that testimony, and the absence of any evidence that Raleigh approved any of the challenged actions, it is clear that the record contains no facts that would support finding Raleigh personally involved in the alleged constitutional violations. Accordingly, he is entitled to summary judgment on the claims against him.

### b.  Eagle and Open Door

I disagree that Plaintiff has failed to raise a question of material fact regarding whether Eagle violated his First Amendment rights by requiring him to stay at Open Door. "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise . . . ." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). The Sixth Circuit has noted that a probation officer's discretion "to select a substance abuse treatment program . . . is of course limited by the defendant's other substantive rights." *United States v. Logins*, 503 F. App'x 345, 352 n.4 (6th Cir. 2012). For that reason, "a probation officer may not abuse his or her discretion by requiring a defendant on supervised release to participate in a faith-based substance abuse treatment program which is inappropriate given the defendant's religious beliefs." *Id.*

The caselaw the Sixth Circuit relied on in *Logins* is instructive. In *Inouye v. Kemna*, the plaintiff alleged that his parole officer required him to attend a religious program "and then recommended revoking his parole because he refused to participate." 504 F.3d 705, 713 (9th Cir. 2007). Tracking the reasoning of other circuits, the court held that the state, through the parole officer, had clearly coerced the plaintiff, who "could be imprisoned if he did not attend [the religious] program and he was, in fact, ultimately returned to prison in part because of his refusal to participate in the program." *Id.*; *see also Kerr v. Farrey*,

95 F.3d 472, 473-474, 476-480 (7th Cir. 1996) (finding violation of the Establishment Clause when a state prison required an inmate, "upon pain of being rated a higher security risk and suffering adverse effects for parole eligibility, to attend a substance abuse counselling program with explicit religious content"). Courts in this District, too, have held that requiring a prisoner or parolee to participate in religious programing as part of their incarceration or as a condition of parole violates the Establishment Clause if the plaintiff is forced to attend over his or her religious-based objections. *Goodwin v. Hamilton*, 2011 WL 893118, at *4 (E.D. Mich. Mar. 14, 2011); *see also Cain*, 2009 WL 2475456, at *11 (noting that "courts have found that, because of the religious focus of the AA/NA programs, forcing prisoners and parolees into such programs violates their clearly established constitutional rights").

The unconstitutional coercion is no less real simply because the parolee was offered a Hobson's choice of entering the religious program or having his parole revoked. After piling up multiple parole violations, the plaintiff in *Bausch v. Sumiec* was told by his parole officer "that as an alternative to parole revocation he could enter the Exodus House residential substance abuse program," which had substantial religious components. 139 F. Supp. 2d 1029, 1031 (D. Wis. 2001). The court had no problem finding this nominal choice unconstitutional: "[b]ecause Exodus House was presented to plaintiff as the only available and feasible alternative to revocation, he faced the 'force of law' and the 'threat of penalty' . . . [as] participating in the Exodus House program was effectively presented to him as a condition of remaining on parole, and so far as he knew, the penalty for declining was being returned to prison." *Id.* at 1034.

28

In the present case, Eagle contends that "there is nothing in the record other than bare assertions in the pleadings or in briefing, to suggest Mr. Veeder objected to residing at Open Door because of the religious component." (ECF No. 84 at PageID.585). In addition, she notes her affidavit in which she denied any recollection of Plaintiff complaining about the religious program. (*Id.*)[8] Further, she asserts that he was not forced to stay at Open Door, as nothing in his parole order required it, he accepted the conditions for remaining at Open Door, and Eagle eventually permitted him to change residencies. (ECF No. 84 at PageID.585-586).

Eagle's argument is unpersuasive. It incorrectly presumes that Plaintiff's statements cannot constitute evidence raising a question of material fact. His amended complaint was made under penalty of perjury, (ECF No. 25 at PageID.146), which allows the Court to consider it at the summary judgment stage per 28 U.S.C. § 1746. *See Owens v. Hinsley*, 635 F.3d 950, 954-955 (7th Cir. 2011) ("Nevertheless, a declaration under § 1746 is equivalent to an affidavit for purposes of summary judgment."); *Collazos-Cruz v. United States*, 117 F.3d 1420 (unpub. op.), 1997 WL 377037, at *2 (6th Cir. 1997) (holding that a declaration under § 1746 can suffice to defeat a motion for summary judgment). In the complaint, Plaintiff asserts that Eagle forced him to stay at Open Door. (ECF No. 25 at PageID.134).

While this statement might not be enough alone to create a material issue of fact, he buttressed it in his deposition. Recall that Plaintiff's parole order prevented him from

---

[8] Eagle also asserts that Plaintiff knew the grievance process but filed none. (*Id.*) She does not contend, however, that he was required submit his objections through a grievance.

changing residencies without Eagle's approval and required him to follow Eagle's verbal orders. (ECF No. 84 at PageID.605). He testified that "Eagle said I had to stay there because I didn't have a residence to parole to." (ECF No. 90 at PageID.767).[9] She would not approve any other residence, he stated, and he did not know of any other shelters. (ECF No. 90 at PageID.767-768). Further, he testified that he gave Eagle a copy of Open Door's rules and "told her I wasn't happy with the . . . religious enforcement, praying, everything." (ECF No. 90 at PageID.767).[10]

Under the caselaw above, this testimony constitutes evidence of a First Amendment violation. The parole order required Plaintiff to follow Eagle's verbal orders. Even without such a requirement, Eagle presumably would have revoked his parole if he failed to attend Open Door because he would be changing his residence without her approval. Either way, he was faced with an unconstitutionally coercive choice: submit to religious programming or suffer the consequences of violating his parole. *See Logins*, 503 F. App'x at 352 n.4; *Bausch*, 139 F. Supp. 2d at 1034. Given this evidence, Eagle's denials do not entitle her to summary judgment; rather, they create an issue of material fact whether Plaintiff was unconstitutionally forced into religious programming.

The question thus becomes whether Eagle is entitled to immunity, either absolute or qualified. She argues for both. Regarding the former, she says that she is entitled to

---

[9] To the extent her statements are hearsay, they are admissible under Fed. R. Evid. 801(d)(2).

[10] The date of this conversation is unknown. And, as noted above, Plaintiff went to Open Door twice, each time signing a copy of the rules. (ECF No. 87 at PageID.697, 709). Thus, it is possible that Plaintiff spent some portion of time at Open Door without having first objected. Still, the evidence in the record would support the conclusion that he objected at some point and was subsequently forced to attend or remain at Open Door. The fact that he may have assented to return to Open Door rather than have his parole revoked does not negate the possibility of unconstitutional coercion. *See Bausch*, 139 F. Supp. 2d at 1034.

quasi-judicial immunity. (ECF No. 84 at PageID.578). The residency requirement, she states, was part of the parole conditions—it was not one she imposed. (*Id.* at PageID.579). Rather, she says she was merely "investigating and monitoring whether Mr. Veeder was complying with the terms of his conditions of parole that required him to seek approval before changing residence." (*Id.* at PageID.578).

Plaintiff cites only to *Balas v. Leishman-Donaldson*, 976 F.2d 733 (unpub. op.), 1992 WL 217735 (6th Cir. 1992). (ECF No. 84 at PageID.578). In *Balas*, the plaintiff sued various bailiffs of a municipal court. 1992 WL 217735, at *1. Addressing quasi-judicial immunity, which attached to non-judicial staff like parole officers, the court explained that this form of immunity turns on a functional analysis of whether the disputed functions were "judicial in nature." *Id.* at *4-5. "Absolute judicial immunity has been only 'quite sparingly' recognized, . . . and the official seeking immunity must show that such immunity is justified for the governmental function at issue." *Id.* at *4. "The decision to open an investigation—notwithstanding the possibility that the investigation could lead to criminal charges—was entirely 'investigatory or administrative in nature, not prosecutorial, judicial or otherwise intimately related to the judicial process.'" *Id.* at *5 (*quoting Achterhof v. Selvaggio*, 886 F.2d 826, 830 (6th Cir. 1989)). "To the extent court personnel were investigating whether [the plaintiff] was complying with the terms of his probation, they were performing a quasi-judicial function." *Id.*

Eagle has not cited, nor have I found, any cases addressing the precise scenario raised here. Courts have rejected claims for qualified immunity in these circumstances, although it does not appear those cases considered quasi-judicial immunity. *See Inouye*,

504 F.3d at 715; *Bausch*, 139 F. Supp. 2d at 1038-1039. Other cases are instructive, although not directly on point.

In *Rose v. Flairty*, 772 F.3d 552 (8th Cir. 2014), quasi-judicial immunity was granted. There, the state court ordered the plaintiff to a specific substance abuse treatment program as part of his probation and made the program's rules and policies part of the probation order. *Id.* at 553-554. When he objected to its religious aspects, the parole officer "responded that [the plaintiff] could either comply with the terms of his probation order or return to prison." *Id.* at 553. The court noted that the officer "himself did not have authority to modify the terms of [the plaintiff's] probation, but [the plaintiff] could have sought relief from the court. He did not, and [the officer] enforced the probation order entered by the court." *Id.* at 554. Thus, the court held that the immunity applied to the officer's conduct. *Id.*; *cf. Huffer v. Bogen*, 503 F. App'x 455, 461 (6th Cir. 2012) (finding court clerk entitled to quasi-judicial immunity because the clerk "merely implemented Judge Bogen's order as instructed"); *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994) ("[E]nforcing or executing a court order is intrinsically associated with a judicial proceeding."); *Reid v. Pautler*, 36 F. Supp. 3d 1067, 1182-1183 (D. N.M. 2014) (holding probation officers' enforcement of a facially valid probation order was covered by quasi-judicial immunity).

In *Thornton v. Brown*, the parole department imposed GPS monitoring on the plaintiff, which it was authorized to do under state statutory law. 757 F.3d 834, 839 (9th Cir. 2013). Plaintiff challenged the GPS monitoring as unconstitutional, but the court held that the officers had immunity. *Id.* at 839-840. "We have held that absolute immunity 'extend[s] to parole officials for the "imposition of parole conditions"' because that task is

'integrally related to an official's decision to grant or revoke parole,' which is a 'quasi-judicial' function." *Id.* at 840 (*quoting Swift v. California*, 384 F.3d 1184, 1189 (9th Cir. 2004)). The GPS conditions "were imposed through particularized and discretionary decisions by parole officers," and consequently the officers had immunity. *Id. Thornton* thus indicates that a parole officer's discretionary act establishing the boundaries of parole is sufficiently "judicial" to warrant immunity. This holding reflects the Supreme Court's pronouncement that "[w]hen judicial immunity is extended to officials other than judges, it is because their judgments are 'functional[ly] comparab[le] to those of judges—that is, because they, too, 'exercise a discretionary judgment' as part of their function." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436 (1993) (citations omitted).

Here, Eagle was not enforcing a court order requiring Plaintiff to attend Open Door and consequently she was neither simply carrying out a provision a judge's order nor monitoring Plaintiff to see whether he had violated the order. There was no court order here, as the parole conditions came from Plaintiff's parole agreement. (ECF No. 84 at PageID.605). But Eagle was given authority by that agreement to approve Plaintiff's residency changes and the parole order also required Plaintiff to comply with her verbal orders. In this manner, her actions resemble those of the parole officers' in *Thornton*, who were similarly authorized to exercise discretion with regard to creating parole conditions. While Eagle's selection of Open Door might not have been an express parole condition, it was tantamount to one: from all that appears, Plaintiff would have violated his parole by residing elsewhere since Eagle had not approved any other residencies.

In addition, I have seen no caselaw suggesting that the decision of where a parolee resides is simply a supervisory or administrative decision. *Cf. Williams v. Consovoy*, 333 F. Supp. 2d 297, 300 n.2 (D. N.J. 2004) (providing examples of executive or administrative actions such as assisting in investigations of parole violations or performing general duties). Nothing about Eagle's decision suggests it was an investigation into a possible violation or another prosecutorial or administrative act, which would not warrant immunity. Her determination is instead more akin to the adjudicatory aspects of parole, such as the parole board's adjudication of parole and crafting any conditions when granting it. A board's parole decision in individual cases gets immunity. *Draine v. Leavy*, 504 F. App'x 494, 496 (6th Cir. 2012).

Other factors to consider when determining whether a process is sufficiently similar to the judicial process include the need to shield the individual from harassment, the presence of safeguards, the availability of appeal, and the adversarial nature of the process. *Flying Dog Brewery, LLLP v. Michigan Liquor Control Comm'n*, 597 F. Appx. 342, 348 (6th Cir. 2015). Here, parole officers need flexibility when determining where their parolees can reside, especially in cases like the present when the parolee was homeless. More importantly, safeguards surrounded Eagle's decision. Within 45 days of a parolee's return to prison (or his availability for return) "under accusation of a parole violation," he or she is entitled to a hearing on the allegation and is permitted to have an attorney (if indigent, one will be provided). Mich. Comp. L. §§ 791.240a(3)-(4). The parolee may also seek judicial review of the Parole Board's revocation of parole because the dispute constitutes a "contested case" under Michigan's Administrative Procedures Act. *See In re*

*Parole of Bivings*, 242 Mich. App. 363, 369 (2000). This indicates, as well, that the decision regarding revocation, at least, is adversarial. The parole officer's antecedent decision on where the parolee can stay is not as clearly made through an adversarial process, but given the parolee's rights to challenge the decision (in a hearing if parole is revoked and later in court), the larger context of the officer's decision is adversarial. Indeed, her decision would become a basis for revocation—like any parole condition—and thus was intimately tied to the revocation process. *Cf. Thornton*, 757 F.3d at 840. And, in this case, Plaintiff was able to present Eagle with options, allowing him to have some input (albeit ineffective) in the decision. (ECF No. 90 at PageID.767-768). Consequently, Eagle's decision functionally resembles a judicial determination.

As such, I conclude that Eagle's determination, under the parole order, concerning Plaintiff's residency is a quasi-judicial decision that deserves immunity. *See generally Richman v. Sheahan*, 270 F.3d 430, 436 (7th Cir. 2001) ("Our quasi-judicial immunity cases demonstrate that the primary function to be protected is judicial or quasi-judicial decision making. This is true of cases challenging discretionary conduct by a quasi-judicial body like a parole board."). For these reasons, I believe that the logic of *Thornton* should apply here and that Eagle be given quasi-judicial immunity.[11]

---

[11] Eagle argues in the alternative for qualified immunity. Reaching this argument is unnecessary under the resolution above. If the Court does address the issue, however, I would reject Plaintiff's argument. Qualified immunity requires a court to consider whether a constitutional right was violated and whether that right was clearly established when it was violated. *Jones v. City Elyria, Ohio*, __F.3d__, 2020 WL 253379, at *4 (6th Cir. Jan. 17, 2020). For the reasons given above, a question of material fact exists as to whether Plaintiff's First Amendment rights were violated. The question remains whether the right was clearly established at the time of the violation. Like the courts above, I would find that it was. Well before the events here, the Sixth Circuit in 2012 stated that a probation officer could not require a supervisee to participate in a religious program over that person's objections. *Logins*, 503 F. App'x at 352 n.4. Even earlier, courts from across

### c.  Claims Involving TRI-CAP

Defendants Eagle and Mangapora also claim that they are entitled to quasi-judicial immunity regarding the TRI-CAP claims. (ECF No. 84 at PageID.579-580). I agree. Plaintiff's complaint alleges that Mangapora and Eagle forced him into the program. (ECF No. 25 at PageID.135). At his deposition, Plaintiff testified that Mangapora somehow arranged for his assignment to TRI-CAP. (ECF No. 90 at PageID.773-774). He later explained that Mangapora and Eagle "referred parolees and probation people there, and they made sure the residents went there. There was a court order. They followed through with the judge's order to go and complete the program." (*Id.* at PageID.774).

Ultimately, however, Plaintiff went to TRI-CAP because the court ordered him to attend as a condition of probation. (*Id.* at PageID.758, 760, 762). Plaintiff has not identified any role that Mangapora or Eagle played apart from facilitating the judge's order; indeed, as shown, he testified that "[t]hey followed through with the judge's order to go and complete the program." (*Id.* at PageID.774). Consequently, they did nothing more than enforce the court order, thus entitling them to quasi-judicial immunity. *See Flairty*, 772 F.3d at 554; *Huffer*, 503 F. App'x at 461.

To the extent this absolute immunity fails to cover any First Amendment claim Plaintiff might have attempted to make against Eagle and Mangapora for denying him

---

the country had found that the right was clearly established. *See Inouye*, 504 F.3d at 715 (rejecting qualified immunity and noting that by 2001 the "unanimous conclusion" of all courts to address the issue was that these actions were unconstitutional); *Bausch*, 139 F. Supp. 2d at 1038-1039 (finding it sufficiently clear that parolees could not be forced to choose between prison and religious programming). In 2007, *Inouye* noted that courts were nearly unanimous in establishing the right in question.  504 F.3d at 715-717. Given this caselaw, there is an issue of material fact regarding whether Eagle violated a clearly established right. Consequently, she is not entitled to qualified immunity.

access to the courts, (ECF No. 25 at PageID.140), I suggest that the claim fails for the reasons given in my earlier Report regarding the same claim made against other defendants. (ECF No. 53 at PageID.329-332). In particular, to bring a denial-of-access claim, a plaintiff must describe the underlying cause of action that he or she was denied from bringing and show that it was not frivolous. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *Hadix v. Johnson*, 182 F.3d 400, 405-06 (6th Cir. 1999). Plaintiff failed to do so here. If Plaintiff meant to say that he was denied from bringing claims regarding the alleged sexual assault at TRI-CAP, he could not show that the relief he would have sought was "now otherwise unattainable" because he did bring such claims and they were dismissed. *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013). Thus, while it is not clear that Plaintiff meant to bring a denial-of-access claim against Eagle and Mangapora—and such a claim would seem to be covered by immunity—it would fail in any event and should be screened and dismissed under 28 U.S.C. § 1915(e)(2)(B).

## III. <u>Conclusion</u>

In light of the above analysis, **IT IS RECOMMENDED** that defendants' motions for summary judgment be **GRANTED** (ECF Nos. 84, 87, 90, 92) and any First Amendment denial-of-court-access claim against Mangapora and Eagle be screened and **DISMISSED** under 28 U.S.C. § 1915(e)(2)(B) for failing to state a claim.

## IV. <u>Review</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may

respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 30, 2020                              S/ PATRICIA T. MORRIS
                                                     Patricia T. Morris
                                                     United States Magistrate Judge

**<u>CERTIFICATION</u>**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.  A copy was also sent via First Class Mail to Randy Veeder #244093 at Saginaw Correctional Facility, 9625 Pierce Road, Freeland, MI 48623.

Date: January 30, 2020                         By <u>s/Kristen Castaneda</u>
                                               Case Manager